UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| Telecommunications Law Professionals PLLC ) <br> 875 15th Street, NW, Suite 750 ) <br> Washington, DC 20005 ) <br> ) <br> ) <br> *Plaintiff,* ) <br> v. ) <br> ) <br> T-Mobile US, Inc. ) <br> 601 Pennsylvania Avenue, NW ) <br> Washington, DC 20004 ) <br> ) <br> *Defendant.* ) <br> ) | C.A. No. _____ |

## COMPLAINT FOR MONEY DAMAGES FOR BREACH OF CONTRACT

Telecommunications Law Professionals PLLC ("Plaintiff" or "TLP"), by its undersigned

counsel, hereby brings this complaint against T-Mobile US, Inc. ("Defendant" or "T-Mobile").

T-Mobile formerly was named MetroPCS Communications, Inc. ("MetroPCS").

### Jurisdiction and Venue

1.     This court has jurisdiction in this matter under 28 U.S.C. §1332(a) as the matter in

controversy:

        a.   exceeds the sum or value of $75,000, exclusive of interest and costs, and

        b.   is between citizens of different states, as set forth in paragraphs 3 and 4 below.

2.     Venue properly exists in this District under 28 U.S.C. §1391(b)(1) and (b)(2), as set forth

in paragraph 4 below.  The contract upon which this complaint is based provides that it shall be

governed, construed and enforced in accordance with the laws of the District of Columbia and that the District of Columbia is a proper venue for any action arising thereunder.

## Parties

3.      Plaintiff TLP is a professional limited liability company organized under the laws of the District of Columbia, with its sole place of business at 875 15th Street, NW, Suite 750 Washington, DC.    TLP is a small law firm practicing principally in the area of telecommunications law.   Carl Northrop ("Northrop") is the managing member of TLP, and Michael Lazarus ("Lazarus") and Andrew Morentz ("Morentz") are its other members.   All members are licensed to practice law in the District of Columbia.

4.      Defendant T-Mobile is a large publicly-traded corporation. T-Mobile is organized under the laws of the State of Delaware, with its principal place of business in Bellevue, Washington. T-Mobile conducts business from offices throughout the United States, including an office in Washington, DC at 601 Pennsylvania Avenue, NW.

5.      T-Mobile is, among other things, a provider of wireless communications services in the United States. Currently, T-Mobile has over 43 million wireless customers and total annual revenues estimated at $24.8 billion.

### The Development and Growth of the Attorney-Client Relationship Between MetroPCS and Northrop, Lazarus and Morentz

6.      From March 1996 through July 31, 2011, Northrop was a partner in the law firm Paul Hastings LLP ("Paul Hastings").  Paul Hastings is a large global law firm with offices across the United States, Europe and Asia. Northrop was a leading partner in the International

2

Telecommunications and Media Practice Group of the law firm (the "Telecom Group"), resident in its Washington, DC office.

7.     MetroPCS engaged Northrop and the Telecom Group of Paul Hastings in October 2004 to advise and represent MetroPCS in connection with an auction by the Federal Communications Commission (the "FCC") of personal communications service ("PCS") broadband wireless spectrum in FCC Auction No. 58.  Northrop and his team were successful in this representation, which ultimately allowed MetroPCS to acquire spectrum rights and licenses on favorable terms and conditions.

8.     The successful representation in FCC Auction No. 58 and other matters caused MetroPCS to engage Northrop and the Telecom Group of Paul Hastings as its principal federal regulatory counsel for telecommunications issues.  Between 2004 and 2011, the scope of this engagement steadily increased as MetroPCS grew in size and stature, and became increasingly involved in matters of federal telecommunications regulatory policy.  During this period, Lazarus and Morentz joined Paul Hastings as attorneys in the Telecom Group and, along with Northrop, devoted significant time and attention to servicing MetroPCS.  In the process, the Telecom Group assisted MetroPCS in securing a number of valuable rights and achieving a number of legal successes including, but not limited to: (a) the acquisition of needed spectrum at suitable prices in FCC auctions and private market transactions; (b) favorable results in FCC rulemaking proceedings affecting MetroPCS' wireless business; (c) the negotiation of acceptable roaming agreements with other wireless carriers, thus enabling MetroPCS' customers to receive wireless services when they traveled outside of the metropolitan areas in which MetroPCS operated networks; (d) the negotiation and consummation of various financing transactions; and (e) favorable outcomes in a variety of civil litigation matters.

3

9.     As its relationship with MetroPCS evolved and grew over time, the Telecom Group of Paul Hastings came to provide a diverse suite of telecommunications-related services to MetroPCS including, but not limited to: (a) federal regulatory advocacy; (b) regulatory counseling; (c) advice and counsel on the regulatory sections of Securities and Exchange Commission filings; (d) representation in spectrum auctions; (e) federal, state and local litigation services on telecommunications matters; (f) the drafting and implementation of telecommunications contracts; (g) representation in connection with FCC investigations and enforcement proceedings; (h) representation in industry trade associations and coalitions; (i) merger and acquisition transactions; (j) financing transactions; and (k) legislative matters.

10.    As a result of the successful development of the MetroPCS account, along with other professional accomplishments, Northrop, Lazarus and Morentz each had well-founded expectations of continued employment at Paul Hastings at compensation levels paid to lawyers of their levels of skill and experience at large, profitable law firms in the Washington, DC market.

11.    In the course of the representation of MetroPCS by Paul Hastings, two issues arose that were matters of potential concern to MetroPCS.  The first was the hourly rates charged by Paul Hastings, which resulted in large monthly bills that fluctuated significantly and thereby impeded MetroPCS' ability to quantify and control its telecommunications regulatory legal expenses. Additionally, because of the rate structure at Paul Hastings, there were some projects and services that MetroPCS would have preferred to be handled by the Paul Hastings Telecom Group, but elected not to as a cost savings measure.

DCACTIVE-23726753.1

12.     The second issue was that potential conflicts of interest arose periodically, which limited the ability of the Telecom Group of Paul Hastings to represent MetroPCS in certain matters. In particular, Paul Hastings had non-telecommunications representation relationships with affiliates of the two major national wireless carriers, Verizon Wireless ("Verizon") and AT&T Mobility ("AT&T"), resulting in Paul Hastings having to refer certain MetroPCS matters potentially adverse to AT&T or Verizon to other law firms. As MetroPCS evolved into the fifth largest facilities-based provider of wireless services in the United States, and became increasingly active in matters of regulatory policy, and as Verizon and AT&T became increasingly dominant in the wireless sector with advocacy positions at variance from those of smaller wireless carriers like MetroPCS, the areas of potential conflict at Paul Hastings grew.

13.     Because of the legal fee and conflict of interest concerns of MetroPCS, Northrop was encouraged periodically by MetroPCS to establish a solo practice or to form a small boutique telecommunications law firm to serve the telecommunications regulatory needs of MetroPCS. Northrop initially was reluctant to do so because of the career opportunities and financial security he would be losing given his tenure and standing at Paul Hastings, and because of the substantial business, financial and career risks associated with operating as a sole practitioner or as the lead lawyer at a newly established small boutique firm, where the practice was highly dependent upon a single client (MetroPCS) in the consolidating wireless telecommunications industry. Such a firm would need to make substantial investments in office space, office equipment, technology and personnel to serve MetroPCS, and would have to avoid certain client relationships with other wireless carriers, thereby potentially inhibiting both the growth and the diversification of the new firm's practice. This would subject such firm to possible closure and

consequential loss of its lawyers' invested capital, time and effort in the event of the termination of its relationship with the client for which it would be creating the new law firm.

### The Formation of TLP and the Strengthening of its Relationship with MetroPCS

14.     Northrop and Mark Stachiw ("Stachiw"), who at the time was the Vice Chairman and General Counsel of MetroPCS, met on May 20, 2011, in Dallas, Texas in an effort to reach agreement on the terms of a mutually acceptable arrangement, pursuant to which Northrop would create a new boutique law firm with the principal mission of serving the needs of MetroPCS. Stachiw was, at the time, a skilled, experienced and sophisticated lawyer and businessman with approximately 25 years of background in the telecommunications industry.  At the time of the discussions with Northrop, Stachiw had been with MetroPCS for more than six years, both as its General Counsel and as a senior officer who had been promoted over time from Vice President, to Senior Vice President, to Executive Vice President and finally to Vice Chairman.  Stachiw had extensive experience negotiating contracts on behalf of MetroPCS, itself a sophisticated company and client.  MetroPCS at the time was a publicly traded company with a market capitalization of approximately $5.8 billion, annual revenues of approximately $4.8 billion and an annual legal department budget of approximately $25 million.

15.     To reduce the business and career risks that Northrop, Lazarus and Morentz faced in considering resignations from Paul Hastings, and to encourage them to create a new small law firm better able to serve the telecommunications law needs of MetroPCS, Stachiw offered Northrop an arrangement under which MetroPCS would pay a fixed monthly retainer to the new law firm sufficient to cover all of its expenses, including compensation of attorneys, for an initial minimum period of two years, even if MetroPCS underwent a change in control.  The new law firm would be free to provide non-conflicting legal services to other clients, provided that those

clients consented to the firm's representation of MetroPCS and agreed not to seek to disqualify TLP from representing MetroPCS.

16.     The terms offered by MetroPCS persuaded Northrop, Lazarus and Morentz to proceed with the formation of TLP. Subsequent negotiations led to a retainer agreement (the "Agreement") between TLP and MetroPCS dated July 8, 2011 (Attachment 1 hereto), for services to commence August 1, 2011. The Agreement established a creative, innovative and mutually-beneficial attorney-client relationship, not based on the hourly billing used by Paul Hastings in servicing the MetroPCS account and which is prevalent in the legal profession.

17.     In consideration for the financial and career risks undertaken by Northrop, Lazarus and Morentz in resigning their positions at a major, profitable international law firm and forming a new, small professional services business, the Agreement included the following key contractual provisions:

    i. MetroPCS agreed to pay TLP a fixed amount per month sufficient to enable TLP to meet its recurring expenses and that was not dependent on the amount of work it did for MetroPCS or the amount of time its lawyers spent on MetroPCS matters.

    ii. MetroPCS' payments to TLP would be on a basis of a general retainer, *i.e.*, unrelated to hours or any other measure of the volume of service provided, and the monthly fixed fee billings would not contain any description of time charges or specific services provided.

    iii. MetroPCS agreed to make periodic payments to TLP to enable TLP to meet periodic non-recurring expenses (including professional liability insurance premiums and annual subscriptions for professional publications).

    iv. The payments due to TLP were subject to certain annual increases.

    v. The Agreement had an initial term of two years (the "Initial Term"). After the Initial Term, the Agreement could be terminated by either party upon six months prior written notice. In the absence of termination or agreement to the contrary, the arrangement would continue, subject to annual upward adjustments in the annual and recurring monthly charges to reflect reasonable cost and salary increases.

DCACTIVE-23726753.1

vi. The Agreement contained a paragraph captioned "Changes in Ownership or Control of MetroPCS or its Assets" which provided, in pertinent part: "MetroPCS acknowledges and agrees that the duration of the Initial Term of this Agreement is a material inducement to [TLP] to enter into this Agreement, and agrees that [TLP] is entitled to receive the payments reflected herein even if MetroPCS undergoes a change in control, a merger, consolidation or other combination, sells or leases all or substantially all of its assets or otherwise enters into a material transaction affecting the ownership and/or control of MetroPCS ...".

vii. The Agreement allowed TLP to provide non-conflicting legal services to other clients.

18. In exchange for the consideration given to TLP, MetroPCS received:

i. A commitment from TLP that each of the four TLP attorneys (the three members and an associate) would make themselves available to MetroPCS the equivalent of full-time (up to 1850 hours of client service to MetroPCS annually). This allowed MetroPCS to receive more hours of service than it previously was receiving from Paul Hastings in order to meet its increasing needs for regulatory counsel.

ii. A flat fee structure that was lower than the monthly fees MetroPCS previously was paying to Paul Hastings, notwithstanding the fact that MetroPCS now was entitled to receive a higher volume of services from TLP. The services available to MetroPCS at the initial monthly retainer rates paid to TLP represented approximately a 40 percent discount off of the rates charged to MetroPCS by Paul Hastings for the same or comparable attorneys in 2011, and a greater than 30 percent discount off of the hourly fees that TLP would charge other clients.

iii. Top priority client status, meaning that TLP could not accept work from other clients without their consenting to the broad representation of MetroPCS by TLP and agreeing not to seek to disqualify TLP from representing MetroPCS.

iv. MetroPCS received credits against its retainer payments for every billable hour of services in excess of 150 hours per annum that a TLP attorney provided to a client other than MetroPCS.

19. In the weeks and months preceding and following the July 8, 2011 Agreement, TLP incurred substantial liabilities in reliance upon the Agreement including, but not limited to, subletting office space in downtown Washington, DC; renting and purchasing office furnishings; acquiring or leasing office equipment and infrastructure; purchasing malpractice and other insurance; engaging professionals (lawyers/accountants/benefits consultants) to establish TLP,

8

set up, and train employees on the TLP accounting system, and to create an employee benefit plan and set up the payroll; hiring attorneys and support personnel; establishing a cloud-based information technology system; setting up legal research services; and acquiring necessary subscriptions to legal and other periodicals, publications and other library resources.

20.     The Agreement proved to be mutually beneficial for both MetroPCS and TLP.  TLP achieved successful outcomes for MetroPCS in multiple matters while providing top priority attention to MetroPCS' legal needs, entirely free of conflicts of interest, all at a fixed monthly fee that was less than what MetroPCS would have paid Paul Hastings for such work.  Further, even though MetroPCS was paying less to TLP than it would have paid to Paul Hastings under its hourly rate structure, MetroPCS received more services from TLP than it had from the Telecom Group at Paul Hastings, a substantial benefit to MetroPCS.  For its part, TLP benefited from a steady cash flow that permitted it to devote primary attention to the legal needs of MetroPCS, and was able to establish a platform for the provision of legal services that enabled it to retain the clients that followed its lawyers from Paul Hastings and to attract new clients.  In short, in an era of increasing concerns over the cost of legal services, the arrangement was a professionally commendable example of a creative departure from conventional law firm/client fee relationships that produced increased value for both parties.

21.     The July 8, 2011 Agreement was the subject of a minor amendment on December 26, 2011, the principal purpose of which was to correct a mathematical error in the calculations in the July 8, 2011 Agreement, and a further minor amendment on May 17, 2012, the principal purpose of which was to add a Research Assistant/Legal Secretary to the roster of TLP personnel providing services to MetroPCS.

DCACTIVE-23726753.1

22.     In May of 2012, TLP was facing certain business decisions that could hinge on whether the initial term of the Agreement was going to be extended and other financial terms adjusted. For example, TLP was facing the prospect of a substantial rent increase and had to consider entering into a longer-term lease in order to achieve a suitable monthly rental rate.  TLP also was considering undertaking new financial commitments in connection with a possible expansion of its professional staff.   As a consequence, TLP approached MetroPCS to discuss a possible amendment to the Agreement.

23.     On or about May 9, 2012, TLP and MetroPCS reached an agreement in principle to extend the Initial Term of the Agreement and to modify certain other terms of the Agreement. The agreement to extend the term was memorialized, along with other changes, in an Amended and Restated Agreement dated September 4, 2012 (Attachment 2 hereto).  Because both parties considered the overall structure of the arrangement to be innovative and mutually-beneficial, the September 4, 2012 revision preserved the basic structure of the original agreement.  However: (a) the term was extended to December 31, 2014 (the "Revised Term") so that both parties could continue to enjoy the benefits of what they each considered to be a "win-win" arrangement; (b) an additional associate was added to the roster of TLP attorneys servicing the expanded legal needs of MetroPCS; (c) the formula for credits to MetroPCS for TLP work done for other clients was adjusted to reflect the fact that the TLP attorneys were working at a billable hour pace higher than the expected billable hour per year target reflected in the original agreement; and (d) the paragraph acknowledging that the agreement was binding even if MetroPCS underwent a transfer of control was modified to broaden the scope of services that an acquiring party could request in order to be in a position to receive full value under the agreement, which was a change

requested by MetroPCS and agreed to by TLP to benefit any acquiring party. This amended and restated agreement dated September 4, 2012 is referred to hereafter as the "Retainer Agreement."

24.     At all times, TLP provided high quality, timely and responsive legal services to MetroPCS.

### The Acquisition by Deutsche Telekom of Majority Ownership of MetroPCS

25.     Deutsche Telekom AG ("Deutsche Telekom") is an international telecommunications company headquartered in Germany with operations in approximately 50 countries, approximately 230,000 employees worldwide, and annual revenue of approximately €58.2 billion for the 2012 financial year. In 2012, and for many years before, Deutsche Telekom was the owner of T-Mobile, USA Inc., the fourth largest wireless telecommunications carrier in the United States. On October 3, 2012, MetroPCS and Deutsche Telekom executed a business combination agreement proposing the combination of the wireless businesses of MetroPCS and T-Mobile into MetroPCS, and the acquisition by Deutsche Telekom of control of the combined company. The business combination agreement was subject to a series of conditions, including the receipt of all requisite government approvals without material adverse conditions (*i.e.*, FCC approval; Department of Justice clearance; clearance by the Committee on Foreign Investment in the United States and by the federal government interagency group known as Team Telecom; and state commission approvals) and shareholder approval.

26.     The MetroPCS/T-Mobile combination was a multi-billion dollar transaction, and the business combination agreement contained specific provisions identifying the categories of agreements that were deemed material and subject to disclosure. The *lowest* disclosure thresholds were for agreements that represented contract values far in excess of the TLP Retainer

DCACTIVE-23726753.1

Agreement. Thus, pursuant to the negotiated agreement, the TLP Retainer Agreement was not required to be disclosed by MetroPCS to T-Mobile. Nonetheless, TLP sought, and received, permission from MetroPCS to provide the Retainer Agreement to T-Mobile, and did so on January 20, 2013. This disclosure was made because TLP wanted the incoming management team to have adequate time to prepare to integrate TLP into the work plan for the restructured company so that T-Mobile would continue to get full value under the Retainer Agreement.

27.     The disclosure of the Retainer Agreement by TLP to T-Mobile was made to T-Mobile attorney Tom Sugrue ("Sugrue"), subject to the express understanding that, prior to the closing of the business combination transaction, the Retainer Agreement would be confidential, and only be shown to other persons with the prior knowledge and consent of TLP and MetroPCS. Upon request of T-Mobile, MetroPCS and TLP consented to the disclosure of the agreement to T-Mobile's general counsel David Miller ("Miller") and T-Mobile in-house attorney Kathleen Ham ("Ham"). TLP offered to meet with Sugrue or others at T-Mobile to discuss the services that TLP was available to provide, and how best to ensure that T-Mobile would receive full value from the Retainer Agreement on a going-forward basis, post-closing.

28.     Several MetroPCS shareholders disapproved of the financial terms of the original Deutsche Telekom offer to acquire control of MetroPCS, and were urging the MetroPCS shareholders to vote against approving the proposed merger at the upcoming MetroPCS stockholders meeting. On April 10, 2013, Deutsche Telekom made a best and final offer for the company. This offer satisfied the objecting shareholders, and the parties proceeded to close the transaction at midnight on April 30, 2013 on revised terms. T-Mobile made the revised offer and entered into the revised business combination agreement with express knowledge of the TLP Retainer Agreement and without registering any objection with TLP.

29.     The principals of TLP had numerous interactions with Sugrue, Miller and Ham between
January 20, 2013 and April 30, 2013 (the closing date of the business combination transaction).
In the course of these interactions, neither Sugrue, nor Miller, nor Ham, nor any other person at
T-Mobile, gave any indication to TLP of any objection to the Retainer Agreement.   To the
contrary, TLP participated extensively and directly with T-Mobile in integration planning, and T-
Mobile took a series of actions which TLP interpreted to mean that TLP attorneys were in the
process of being integrated into the legal work plan for the combined companies.   These actions
included: (a) the designation by Sugrue of TLP as the recipient, post-closing, of regulatory files
previously maintained by Stachiw for review and analysis; (b) regular interactions with T-Mobile
legal personnel on FCC rulemaking proceedings of interest to both MetroPCS and T-Mobile; (c)
active participation in the MetroPCS/T-Mobile integration planning process; (d) recurring
consultations with T-Mobile legal personnel regarding appellate cases to which MetroPCS was a
party in the federal courts of the District of Columbia Circuit (data roaming and net neutrality),
the 10th Circuit (intercarrier compensation), and the 9th Circuit (Ronan Telephone); (e) the
preparation of summaries of pending MetroPCS regulatory matters, including analysis as to
circumstances where the public MetroPCS position diverged or coincided with the public T-
Mobile position on such matters; (f) fielding of regular phone calls from T-Mobile attorneys
seeking information on MetroPCS programs, policies and procedures; (g) working with
MetroPCS personnel, at the specific request of T-Mobile, to ensure the timely filing of regulatory
reports and compliance with various FCC programs, policies and procedures; (h) evaluating the
company's compliance with various voluntary industry guidelines to which T-Mobile subscribed
and MetroPCS did not; and (i) responding to other general inquiries from T-Mobile on

13

integration and regulatory legal and policy matters.  TLP reasonably inferred from these T-Mobile requests for legal services that the Retainer Agreement would be honored by T-Mobile.

30.    Had TLP been aware that these actions were being taken by T-Mobile not to integrate the TLP team into the T-Mobile regulatory structure, as TLP was relying upon, but instead in anticipation of a possible termination of the Retainer Agreement, TLP would have immediately considered taking a series of actions between January and May to mitigate the impact of T-Mobile's action and to reduce TLP commitments and expenses, including: (a) a reduction in member financial draws; (b) a reduction in employee benefits; (c) a reduction in personnel; (d) a reduction in travel and business development expenses; (e) a reduction in employee training expenses; (f) a reduction in expenditures on office equipment and office furniture; (g) a reduction in expenditures on technology, equipment and IT infrastructure; and (h) such other steps as TLP would have considered prudent to conserve financial resources and scale back its operations in advance of a purported termination of the Retainer Agreement by T-Mobile.  TLP also would have taken additional steps during the period between January and May to accelerate its pursuit of new clients in an effort to replace the monthly Retainer Agreement revenue.

**Renunciation of the Retainer Agreement by T-Mobile**

31.    Deutsche Telekom's acquisition of a majority interest in MetroPCS closed at midnight on April 30, 2013.  Several days before the closing, Northrop contacted Sugrue to schedule a meeting to discuss the services that TLP was providing to MetroPCS under the Retainer Agreement.  At that meeting, which was rescheduled at the request of Sugrue from April 30, 2013 to May 1, 2013, Sugrue told TLP for the first time that T-Mobile did not intend to honor the Retainer Agreement, and that T-Mobile did not intend to make the Retainer Agreement payment due on or before June 1.  Sugrue further indicated that services provided by TLP to T-

14

Mobile in the month of May, for which TLP had been paid in advance by MetroPCS in accordance with the terms of the Retainer Agreement, were considered by T-Mobile to be without prejudice to the right of T-Mobile to terminate the Retainer Agreement as of May 31, 2013.

32.   In the period from May 1, 2013 to the present, TLP has remained ready, willing and able to provide all services to which T-Mobile is entitled under the Retainer Agreement.  TLP did, in fact, provide valuable services to T-Mobile in the month of May 2013, upon the request of various individuals at T-Mobile.

33.   By letter dated and delivered to TLP on May 31, 2013, T-Mobile purported to terminate the Retainer Agreement as of May 31, 2013, and declined to make any further payments to TLP under the Retainer Agreement, including the payments for June and July 2013, which were due on June 1, 2013 and July 1, 2013, respectively, and have not been paid.   There was no cause for the purported termination of the Retainer Agreement other than T-Mobile's decision to use other legal counsel for its telecommunications law needs.

34.   By May 31, 2013, TLP had substantially performed its obligations under the retainer arrangement by:

     a.  Creating and preserving itself as a law firm committed to performing all of the telecommunications law legal needs of MetroPCS;

     b.  Giving MetroPCS the substantial benefit of steeply reduced legal expenses for almost two years;

     c.  According MetroPCS priority, conflict-free service;

     d.  Achieving favorable results in regulatory, commercial and litigation matters;

     e.  Being ready, willing and able to provide the services covered by the Retainer Agreement to MetroPCS both before and after the transfer of control in May 2013;

     f.  Having performed for over 22 months of the 24-month Initial Term and over one half of the Revised Term; and

g. Hiring staff and dedicating resources for the specific purpose of meeting the federal communications law needs of MetroPCS.

## The Impact on the TLP Platform of the T-Mobile Failure to Pay

35.     One of the key benefits to TLP of the bargain it struck with MetroPCS was the opportunity to establish a platform to provide legal services, not only to MetroPCS, but also to other clients whose interests did not conflict with MetroPCS.  And the term of the Retainer Agreement was established to provide sufficient time for the TLP platform to become sustainable, even if its work for MetroPCS declined in the future.

36.     Prior to the termination of the Retainer Agreement by T-Mobile, TLP's efforts to create a sustainable platform were succeeding.  TLP has received favorable ratings by numerous leading legal rating agencies and publications, including Chambers USA, Legal 500 and U.S. News & World Report.  The TLP client base was growing, as reflected in a steady increase in the monthly billings from new clients.

37.     Despite these accomplishments, the ability of the TLP platform to survive in its current form is threatened by the failure of T-Mobile to make the payments due under the Retainer Agreement on a timely basis and T-Mobile's express indication that it does not intend to honor the terms of the Retainer Agreement.  Thus, the actions of T-Mobile have had the direct and foreseeable result of adversely affecting the ability of TLP to serve its other clients on an ongoing basis and to attract new clients utilizing its unique platform, resulting in a substantial loss of profits to the enterprise.

## Legal Claim – Breach of Contract

38.     TLP re-alleges Paragraphs 1 to 37.

16

39.     By reason of its conduct as alleged above, T-Mobile has breached the Agreement and the Retainer Agreement, which are valid and enforceable contracts with TLP.

40.     Such breach has caused injury to TLP in the following respects:

       a.     TLP has not been paid by T-Mobile, and will not be paid by T-Mobile, the following amounts due to TLP at the specified dates under the Retainer Agreement: $244,442.92 on June 1, 2013; $222,095.16 on July 1, 2013; $257,581.04 on August 1, 2013; $257,581.04 on September 2, October 1, November 1 and December 1, 2013; $269,801.03 per month from January 1, 2014 through December 31, 2014; and $283,291.08 per month thereafter through June 30, 2015, including all late fees owed and less all applicable credits under the Retainer Agreement.  TLP also has not been paid by T-Mobile, and will not be paid by T-Mobile, the amount due under the Agreement.

       b.     TLP will not be paid by T-Mobile $135,000 on July 15, 2013 and again on July 15, 2014, to reimburse TLP for the cost of periodic non-recurring expenses, as T-Mobile promised to do;

       c.     The loss of payments described in Paragraphs 40.a. and 40.b. above deprives TLP of the ability to continue in operation under its unique business format and cost structure, which would be difficult or impossible to replicate at another law firm, thereby depriving it of the ability to earn a profit in excess of $3,000,000 from other clients during the term of the Retainer Agreement and thereafter.

       d.     Such other injuries that the court may find were suffered by TLP as a result of the breach of the Retainer Agreement (or the Agreement) by T-Mobile.

DCACTIVE-23726753.1

## **Legal Claim in the Alternative – Unjust Enrichment**

41.     TLP re-alleges Paragraphs 1 to 37.

42.     By reason of its conduct as alleged above, TLP alleges, in the alternative, that T-Mobile has been unjustly enriched by TLP's performance of legal work for MetroPCS at discounted rates.

43.     As set forth above, and as specifically stated in the Agreement and Retainer Agreement, the term of the arrangement was a material inducement to Northrop, Lazarus and Morentz leave Paul Hastings to form TLP.  Absent the term of the Agreement, Northrop, Lazarus and Morentz would never have agreed to: (a) leave Paul Hastings to form TLP; or (b) to provide legal services to MetroPCS at the discounted rates and on the terms which are set forth in the Agreement and Retainer Agreement.  Therefore, because of T-Mobile's renunciation of the Retainer Agreement, T-Mobile – as the acquirer of MetroPCS – has been unjustly enriched by the difference, to be determined at trial, between the amount that MetroPCS would have paid under the hourly rate fees that TLP would have charged MetroPCS absent a long-term retainer commitment and the fees actually paid to TLP for the work performed by TLP attorneys between August 1, 2011 and April 30, 2013.

/

/

/

/

/

/

/

18

WHEREFORE, TLP seeks a judgment in its favor and against T-Mobile for its losses as alleged above, for interest as allowed by law on such amounts, and for such other relief as may be proper under the circumstances.

Respectfully submitted,

Barry E. Cohen
Bar No. 180505
bcohen@crowell.com

Aryeh S. Portnoy
Bar No. 464507
aportnoy@crowell.com

Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
202-624-2500

DCACTIVE-23726753.1